IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

INVICTUS AEROSPACE GROUP, LLC,

    *Plaintiff*,

    v.

POINT BLANK ENTERPRISES, INC.,

    *Defendant*.

Civil Action No. ELH-19-2983

## MEMORANDUM OPINION

In this contract dispute, plaintiff Invictus Aerospace Group, LLC ("Invictus") filed suit against defendant Point Blank Enterprises, Inc. ("PBE"), claiming that PBE failed to pay commissions due in accordance with the terms of the parties' agreement. *See* ECF 1 (the "Complaint"). In particular, the Complaint alleges claims for breach of contract (Count I); unjust enrichment (Count II); quantum meruit (Count III); promissory estoppel/detrimental reliance (Count IV); and intentional misrepresentation-fraud (Count V). *Id.* ¶¶ 52-88.[1] Several exhibits are appended to the suit. *See* ECF 1-2 to ECF 1-4.

Two motions are pending. PBE has moved to transfer venue to the U.S. District Court for the Southern District of Florida, pursuant to 28 U.S.C. § 1404. ECF 16. The motion is supported by a memorandum of law (ECF 16-1) (collectively, the "Motion to Transfer") and two exhibits. ECF 16-2; ECF 16-3. Invictus opposes the Motion to Transfer (ECF 23), and has submitted four exhibits. ECF 23-2 to ECF 23-5. PBE has replied. ECF 24.

---

[1] Invictus was "duly formed" in Arizona, where its principal office is located. ECF 1, ¶ 1. PBE is a Florida corporation. *Id.* ¶¶ 2, 7. Therefore, this Court has diversity jurisdiction under 28 U.S.C. § 1332.

PBE has also moved to dismiss Count V. ECF 20. It is supported by a memorandum of law.  ECF 20-1 (collectively, the "Motion to Dismiss").  Invictus "is not opposing Defendant PBE's Motion to Dismiss Count V of the Complaint."  ECF 23-1 at 14 n.6.  Accordingly, I shall grant the Motion to Dismiss.

No hearing is necessary to resolve the Motion to Transfer.  *See* Local Rule 105.6.  For the reasons that follow, I shall deny the Motion to Transfer.

## I.   Factual Background[2]

According to plaintiff, in 2015 PBE "acquired certain assets of The Protective Group" ("TPG"), a company that manufactures ballistic armor.  ECF 1, ¶ 8.  Invictus's Vice-President, Nathaniel ("Nate") Hoffman, had previously worked for TPG.  *Id.* ¶ 9.[3]  Because of Hoffman's experience with TPG and his "expertise in ballistic armor sales in the Middle East, Africa, Asia, South America, and Europe[,]" PBE "solicited" Hoffman in September 2016, "on behalf of Invictus," to "manage business development on behalf of PBE in Huntsville, Alabama."  *Id.* ¶ 10. The parties subsequently engaged in contract negotiations concerning Invictus's "territory, the scope of [its] business development duties, and compensation."  *Id.* ¶ 11.  On or about December 21, 2016, Invictus, through Nate Hoffman, executed a "Professional Services Agreement" (the "Contract").  ECF 1, ¶ 14; ECF 1-2.  Lex Watson, the Vice President and General Manager of PBE, signed the Contract on behalf of PBE on January 6, 2017.  ECF 1-2 at 5.  The Contract had a term of thirty-six months.  ECF 1, ¶ 16; ECF 1-2 at 1.[4]

---

[2] The facts are drawn from the Complaint and the exhibits appended to it.

[3] To distinguish Nate Hoffman from James Hoffman, the CEO of Invictus, I shall generally use their first and last names.

[4] The Contract contains two paragraphs numbered 16.  This citation refers to the first one.

Under the Contract, PBE was to pay Invictus a monthly retainer of $4,000.  ECF 1, ¶ 12. According to plaintiff, PBE acknowledged that this amount "was low and below industry standards[.]"  *Id.*  However, PBE also "promised Invictus that it would establish a commission schedule for Invictus, and that said commission schedule would be commensurate with the commission schedules received by comparable consulting firms."  *Id.* ¶ 13.

The Contract identifies Invictus as the "Contractor."  ECF 1-2 at 1.  As to "Scope of Work," the Contract provides that "CONTRACTOR shall focus its sales and marketing efforts on the U.S. federal government market … and selected subcontractors and commercial companies as mutually agreed…."  *Id.*, § 2.1.  And, it contains the following provisions in Paragraph 3, concerning compensation, ECF 1-2 at 2-3:

3. Retainer Fee and Commission.

3.1 Retainer Fee. PBE agrees to pay CONTRACTOR a monthly retainer fee of Four Thousand Dollars ($4000.00) due and payable in advance on the 1st day of each month during the term of this Agreement (the "Retainer Fee").

3.2 Commission. In addition to the Retainer Fee, PBE shall pay CONTRACTOR commission on sales secured by CONTRACTOR and awarded to PBE (the "Commission"), as follows:

| PBE Sales | Commission payable to CONTRACTOR |
|---|---|
| Up to $10.0 million | 1.0% |
| $10.0 million and up | 2.0% |

Contractor's commission rate is based on cumulative sales during the term of this [A]greement. When the total amount of PBE sales secured by CONTRACTOR equals or exceeds $10 million annually, Contractor's commission on such incremental sales will be paid at the 2% rate.

Example: If CONTRACTOR secures two contracts for PBE totaling $9,700,000, commission due to CONTRACTOR is 1% of $9,700,000 or $97,000. If CONTRACTOR later secures an additional $1 million contract for PBE, commission due to CONTRACTOR on the new contract would be calculated as 1% on $300,000 plus 2% on $700,000, or $17,000 ($3,000+$14,000).

3.2.1 PBE shall pay all commissions to CONTRACTOR within thirty (30) days after PBE receives payment from its customer.

3.2.2 Upon mutual agreement of the Parties, CONTRACTOR's commission rate may be revised during negotiations with a specific customer, allowing for flexibility in negotiating final pricing.

3.2.3 So long as a PBE sale or sale from a contract arises from the work of CONTRACTOR under this Agreement up to twelve (12) months after termination, PBE will be obligated to pay CONTRACTOR the Commission set forth herein, even if this Agreement is terminated prior to the consummation of such sale or contract or payment by PBE's customer.

3.3 Any and all Retainer Fees and Commission payments made by PBE to CONTRACTOR pursuant to this Agreement shall be made by wire transfer pursuant to instructions provided by CONTRACTOR.

3.4 The Parties may mutually agree to modify and/or expand the Scope of Work, and in such event, the Parties will also negotiate appropriate modifications to CONTRACTOR's Retainer Fee and Commission.

Of relevance here, Paragraph 9 of the Contract contains a forum selection clause, *id.* at 4:

9. <u>Governing Law/Jurisdiction</u>. [PBE standard forum of law is Florida] This Agreement is made and entered into in the State of Maryland and shall be governed and construed in accordance with the laws of Maryland, without regard to its conflict of laws principles.  The Parties also agree that any dispute between the parties shall be resolved in the courts of Maryland, and each party consents to the exercise of personal jurisdiction by the courts of Maryland and expressly waives any argument of forum nonconveniens.  The Parties waive a trial by jury.

And, Paragraph 11 of the Contract provides that modifications to the Contract must be made in writing, *id.*:

11.  <u>Modification; Assignment</u>.  This Agreement shall not be amended or assigned except by mutual written agreement of the parties.

Pursuant to the Contract, Invictus was "to perform Huntsville sales development as an authorized representative of Defendant PBE to to [sic] assist PBE in obtaining contracts for PBE products and services."  ECF 1, ¶ 14.  And, as indicated, Invictus was to "focus its sales and marketing efforts on the U.S. federal government market, U.S. federal government prime contractors, and selected subcontractors and commercial companies as mutually agreed by the

4

Parties." ECF 1-2 at 1, § 2.1; *see* ECF 1, ¶ 15.  And, according to Invictus, Nate Hoffman "was specifically instructed to focus his sale[s] effort on US Army Aviation aircraft." ECF 1, ¶ 15.[5]

In reliance on the terms of the Contract, Nate Hoffman relocated from Denver, Colorado, to Huntsville, Alabama. *Id.* ¶ 18.  According to Invictus, at a meeting that followed execution of the Contract, Invictus was tasked with managing PBE's "Huntsville programs regarding the following: UH-60 Blackhawk Helicopter, the CH-47 Chinook Helicopter, and Non-Standard Rotary Wing Helicopters." *Id.* ¶ 19.  And, in March 2017, Invictus was instructed "to begin international sales on behalf of Defendant PBE." *Id.* ¶ 20.

Invictus alleges that the scope of work assigned by PBE "increased dramatically" during 2017. *Id.* ¶ 21.[6]  According to Invictus, PBE expanded the scope of Invictus's work to include "international sales of all its product lines, attending conference(s), research and development, and proposal development and management." *Id.*  For example, Invictus submitted proposals on behalf of PBE to the Department of Homeland Security. *Id.*  Yet, despite this increased workload, beginning in June 2017, PBE allegedly failed to pay Invictus "in accordance with the terms of the Contract." *Id.* ¶ 22.  Invictus claims it was not paid for its June services until June 29, 2017, *i.e.*, almost a month past the contractual due date. *Id.* ¶ 23.

According to Invictus, for the remainder of 2017 and during 2018, PBE continued to increase the scope of work. *Id.* ¶ 25.  Among other things, Invictus was required to "pursue international body armor sales" in a variety of countries, to travel to foreign destinations, and to organize and attend social events. *Id.*  And, Invictus was instructed to train PBE's employees "on international sales practices, procedures and policies." *Id.* ¶ 26.

---

[5] Plaintiff does not specify the Contract provision that substantiates this assertion.

[6] The Complaint contains two paragraphs numbered "21".  This citation is to the second such paragraph.

Invictus asserts that in October 2017, it secured sales contracts for the CH-47 UAE in the amount of $6,885,617.26. *Id.* ¶ 27. However, in December 2017, PBE "unilaterally made the determination that Invictus was to receive a commission of one-half (1/2) percent instead of the full one (1) percent as mandated by the Contract." *Id.* ¶ 28. And, Invictus alleges that PBE paid no commissions in all of 2017. *Id.* ¶ 29. Rather, Invictus was paid a commission of one-half percent in January 2018, with the promise of payment of the remaining one-half percent in 2018. *Id.* ¶ 30.

According to plaintiff, the Contract was modified on January 1, 2018. *Id.* ¶ 31. Specifically, plaintiff claims that the monthly retainer payable to Invictus increased from $4,000 to $6,000. *Id.*[7] Invictus also asserts that the 2018 Modification did not alter the commission structure of the original Contract. *Id.* ¶ 32.

Invictus alleges that "PBE continued its pattern of late payments" to Invictus, "all while continuing to promise to pay Plaintiff Invictus in accordance with the terms of the Contract and the January 2018 Modification." *Id.* ¶ 33. Throughout 2018, PBE "continued to expand Plaintiff Invictus' scope of work, all while at the same time continuing to promise the Plaintiff that it eventually would be paid the full amounts due and owing to Plaintiff Invictus in accordance with the terms of the Contract Documents." *Id.* ¶ 38.

---

[7] Invictus cites to Exhibit B as the January 2018 modification. ECF 1, ¶ 31. Invictus's Exhibit B is docketed at ECF 1-3, and it appears that part of it is also docketed at ECF 1-4 at 1-2. Exhibit B contains a "Professional Services Agreement" between Invictus and Col. (Ret.) Al Rumphrey, dated March 15, 2018. ECF 1-3 at 1-8. Exhibit B also includes a "Professional Services Agreement Amendment" between Invictus and PBE, docketed at ECF 1-4 at 1-2. It is dated June 1, 2018, not January 1, 2018, as plaintiff alleged. *Id.* at 1. This amendment extends the Contract to December 31, 2021. *Id.* at 2. It also raised the retainer fee to $8,000 per month. *Id.*

ECF 1-4 also contains Exhibit C. ECF 1-4 at 3. This exhibit is not titled. *Id.* But, Invictus cites to it as the Zureikat Amendment. ECF 1, ¶ 34.

And, Invictus alleges that it executed a number of supplemental contracts for PBE. In March 2017, at the request of PBE, Invictus "executed a representation agreement" between Invictus and Col. (Ret.) Al Rumphrey. *Id.* ¶ 21;[8] ECF 1-3 (the "Rumphrey Agreement"). The Rumphrey Agreement was executed by Col. Rumphrey and James Hoffman, CEO of Invictus, on March 15, 2018, and is titled "Professional Services Agreement." ECF 1-3. The terms of the representation agreement required Invictus to pay Col. Rumphrey $1,500 per month. *Id.* at 2. Invictus contends that PBE was then to reimburse Invictus the sum of $2,000 per month. ECF 1, ¶ 21.

Similarly, in May 2018, PBE asked Invictus to "execute a representation agreement between Defendant PBE and Anwar Zureikat. . . , a consultant." *Id.* ¶ 34. Invictus was to pay Zureikat $2,000 per month, for which PBE would reimburse Invictus. *Id.* The agreement (ECF 1-4 at 3, the "Zureikat Agreement") was signed by Kathleen Hoffman, Chair of the Board of Invictus, on May 29, 2018. But, the exhibit does not reflect that it was signed by PBE. *Id.* at 3. According to plaintiff, from July to December of 2018, it paid Zureikat $2,000 per month, as requested by PBE, but it was never reimbursed by PBE. ECF 1, ¶ 36.

Invictus claims that in October 2018, at the request of PBE, it began to develop a business plan for "US Army aviation Research & Development (R&D) program(s)...." *Id.* ¶ 38.[9] For this work, PBE agreed to reimburse Invictus an additional $2,000 per month. *Id.* That month, PBE also indicated to Invictus that "a new professional services agreement, which included a higher retainer, was forthcoming." *Id.* ¶ 41. However, the updated agreement was never executed. *Id.*

---

[8] This citation is to the first paragraph numbered "21" in the Complaint.

[9] The Complaint contains two paragraphs with the number 38. This citation is to the second such paragraph.

Invictus continued to work through February 2019, in reliance on the Contract and the supplements (the "Contract Documents"). *Id.* ¶ 42. In March 2019, "PBE again instructed Plaintiff Invicttus [sic] to invoice Defendant for only one-half percent (1/2 %) of its commissions due and owing under the Contract Documents." *Id.* ¶ 43. However, Invictus invoiced PBE for "all outstanding unpaid and delinquent commissions that Defendant PBE owed Plaintiff Invictus in accordance with the Contract Documents and in accordance with Defendant PBE's multiple promises to pay as agreed." *Id.* ¶ 44. Five days later, PBE terminated the Contract. *Id.* ¶ 45.

Invictus alleges that PBE owes Invictus $571,176.19. *Id.* ¶ 51. According to Invictus, it "performed its duties in accordance with the Contract" and the addenda. *Id.* ¶ 39. It claims that it expanded its scope of work in reliance on PBE's promises of payment in accordance with the parties' agreements. *Id.* ¶ 40. Further, it claims to have "generated substantial sales" for PBE, for which it has not been paid. *Id.* ¶¶ 47, 50.

Moreover, Invictus contends that PBE "never intended to pay Plaintiff Invictus in accordance with the terms of the Contract Documents." *Id.* ¶ 48. Rather, it alleges that the "contractual relationship with Defendant PBE was all a scheme whereby Plaintiff Invictus would impart and educate Defendant PBE in its expertise, knowledge, strategies, contracts and business development skills. . . so that Defendant PBE could eventually terminate the services of Plaintiff Invictus for its own financial gain." *Id.* ¶ 49.

## II. Discussion

### A.

As noted, PBE seeks the transfer of this case to a federal court in Florida. The Motion to Transfer implicates 28 U.S.C. § 1404(a), which states, in part: "For the convenience of parties

and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

Notably, § 1404(a) "reflects an increased desire to have federal civil suits tried in the federal system at the place called for in the particular case by considerations of convenience and justice." *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964). To that end, it helps "to prevent the waste 'of time, energy, and money' and 'to protect litigants, witnesses, and the public against unnecessary inconvenience and expense.'" *Id.* (citation omitted). Ultimately, § 1404(a) "tempers the effects" of the plaintiff's choice of venue. *In re: Volkswagen of Am., Inc.*, 545 F.3d 304, 313 (5th Cir. 2008).

The standard for a § 1404(a) transfer can be distilled, as follows: "(1) the transferee court must be a court in which the action could have been brought initially; (2) the transfer must be convenient to the parties and witnesses; and (3) the transfer must be in the interest of justice." *Dow v. Jones*, 232 F.Supp.2d 491, 499 (D. Md. 2002). Thus, the transfer analysis "calls on the district court to weigh in the balance a number of case-specific factors." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988). These include: "(1) the weight accorded to plaintiff's choice of venue; (2) witness convenience and access; (3) convenience of the parties; and (4) the interest of justice." *Tr. of the Plumbers and Pipefitters Nat. Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 444 (4th Cir. 2015); *see, e.g.*, *Mamani v. Bustamante*, 547 F. Supp. 2d 465, 469 (D. Md. 2008); *Cross v. Fleet Reserve Ass'n Pension Plan*, 383 F. Supp. 2d 852, 856 (D. Md. 2005); *Lynch v. Vanderhoef Builders*, 237 F. Supp. 2d, 615, 617 (D. Md. 2002).

In a motion to transfer venue pursuant to § 1404(a), the moving party bears the burden of showing, by a preponderance of the evidence, that transfer to another venue is proper. *See Gilbert v. Freshbikes, LLC*, 32 F.Supp.3d 594, 607 (D. Md. 2014); *CoStar Realty Info., Inc. v.*

*Meissner*, 604 F.Supp.2d 757, 770 (D. Md. 2009); *Lynch v. Vanderhoef Builders*, 237 F.Supp.2d 615, 617 (D. Md. 2002). "In order to carry this burden, the movant should submit, for example, affidavits from witnesses and parties explaining the hardships they would suffer if the case were heard in the plaintiff's chosen forum." *Dow v. Jones*, 232 F.Supp.2d 491, 499 (D. Md. 2002) (citing *Helsel v. Tishman Realty & Constr. Co.*, 198 F.Supp.2d 710, 712 (D. Md. 2002)). As Judge Blake observed in *Dow*, 232 F.Supp.2d at 499, where the movant only provides "[m]ere assertions of inconvenience or hardship," it will not have met its burden.

Ultimately, "[t]he decision whether to transfer is committed to the sound discretion of the trial court." *Mamani*, 547 F. Supp. 2d at 469; *see also In Ralston Puriam Co.*, 726 F.2d 1002, 10005 (4th Cir. 1984). In the exercise of its discretion, the court should make "'an individualized, case-by-case consideration of convenience and fairness.'" *United States ex rel. Salomon v. Wolff*, 268 F.Supp.3d 770, 774 (D. Md. 2017) (quoting *Stewart*, 487 U.S. at 29) (internal quotation marks and citation omitted).

In most cases, the plaintiff's choice of forum is presumptively convenient, and "'should rarely be disturbed.'" *Mamani*, 547 F.Supp.2d at 469 (quoting *Collins v. Straight Inc.*, 748 F.2d 916, 921 (4th Cir. 1984)); *see also SAS Inst., Inc. v. World Programming Ltd.*, 468 F. App'x. 264, 266 (4th Cir. 2012). But, "[t]he presence of a valid forum-selection clause requires district courts to adjust their usual § 1404(a) analysis. . . ." *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 64 (2013). As the Supreme Court said in *Atl. Marine*, 571 U.S at 63 (citation omitted), "[t]he calculus changes ... when the parties' contract contains a valid forum-selection clause, which 'represents the parties' agreement as to the most proper forum.'" In that circumstance, "'a valid forum-selection clause [should be] given controlling weight in all but the most exceptional cases.'" *Id.* (alteration in *Atl Marine*) (quoting *Stewart*, 487 U.S. at 33).

Pursuant to a forum selection clause, parties may "consent to personal jurisdiction, or at least a waiver of any objection…." *Meissner*, 604 F. Supp. 2d at 764; *see also Consulting Engineers Corp. v. Geometric Ltd.*, 561 F.3d 273, 282 n.11 (2009). And, a forum selection clause "should be honored" when it is the product of "arm's-length negotiation by experienced and sophisticated businessman…." *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 12 (1972); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471 n.14 (1985) (noting that parties may consent to resolve their disputes in specified tribunals).

In this case, the plaintiff's choice of forum coincides with the forum designated in the forum selection clause of the Contract.

In *Olawole v. Actionet, Inc.*, PX-116-3506, 2017 WL 1230821 (D. Md. Apr. 3, 2017), Judge Xinis of this Court used a "three-step analysis to assess the enforceability and applicability of a forum selection clause as to the plaintiff," a non-party to that agreement. *Id.* at *2. First, the court must determine whether the clause is mandatory. If so, it is "'presumptively enforceable.'" *Id.* (citation omitted). Second, the court must determine whether the specific claims fall within the scope of the clause. *Id.* Third, the court must determine if "'the party opposing enforcement has rebutted the presumption of enforceability by providing that enforcement would be unreasonable.'" *Id.* (citation omitted).

Judge Xinis applied federal law in the court's analysis, as the underlying action was based on federal question jurisdiction. And, to the extent that a forum selection agreement "implicate[s] the appropriate venue of a court," it is a procedural matter governed by federal rule and statutes. *Albermarle Corp. v. Astra Zeneca UK Ltd.*, 628 F.3d 643, 650 (4th Cir. 2010). *But see Abbott Labs. v. Takeda Pharm. Co.*, 476 F.3d 421, 423 (7th Cir. 2007) (stating that the law of

the jurisdiction "whose law governs the rest of the contract" determines the validity of a forum selection clause).

However, in the context of diversity jurisdiction, relevant state law applies. *See Varsity Gold, Inc. v. Lunenfeld*, CCB-08-550, 2008 WL 5243517, at *2 (D. Md. Dec. 12, 2008). In any event, Maryland has adopted the federal standard with regard to the evaluation of forum selection clauses. *See Koch v. Am. Online, Inc.*, 139 F. Supp. 2d 690, 693 (D. Md. 2000). And, Maryland courts follow the rule of *lex loci contractus*, applying the substantive law of the state where the contract was formed, unless there is a choice-of-law provision in the contract. *Am. Motorists Ins. Co. v. ARTRA Grp., Inc.*, 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995); *Griffith Energy Servs., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 224 Md. App. 252, 274, 120 A.3d 808, 821 (2015); *U.S. Life Ins. Co. v. Wilson*, 198 Md. App. 452, 462-63, 18 A.3d 110, 116 (2011). In this case, the Contract specifies that Maryland law is applicable to the parties' disputes.

A mandatory selection clause is one that contains "clear language showing that jurisdiction is appropriate only in the designated forum." *Davis Media Grp., Inc. v. Best Western Int'l, Inc.*, 302 F. Supp. 2d 464, 467 (D. Md. 2004). In contrast, a permissive clause "permits jurisdiction in the selected forum without precluding it elsewhere." *Id.* Of import here, the Fourth Circuit has said: "A general maxim in interpreting forum selection clauses is that an agreement conferring jurisdiction in one forum will not be interpreted as excluding jurisdiction elsewhere unless it contains specific language of exclusion." *IntraComm, Inc. v. Bajaj*, 492 F.3d 285, 290 (4th Cir. 2007). That is, a forum selection clause is permissive unless specific language excludes other jurisdictions.

For example, in *FindWhere Holdings, Inc., v. Systems Environmental Optimizations, LLC*, 626 F.3d 752 (4th Cir. 2010), the Court concluded that the phrase "any dispute or legal action ... *shall lie exclusively in*" rendered the forum selection clause mandatory and excluded any other proper venues.  *Id.* at 754 (emphasis added).  Similarly, in *Rihani v. Team Exp. Distributing*, LLC, 711 F. Supp. 2d 557 (D. Md. 2010), the forum selection clause stated that "venue for all actions arising out of or in any way related to this Agreement *shall be irrevocably* set in Howard County, Maryland." *Id.* at 558 (emphasis added). The court concluded that this language clearly excluded any other jurisdiction and expressly mandated suit in Howard County. *Id.* at 561.

Nevertheless, the word "may" does not automatically render a forum selection clause permissive. In certain circumstances, the word "may" can function as the equivalent of "shall" and thus support the reading of a forum selection clause as mandatory. *See, e.g.*, *Doyon Drilling, Inc. v. Loadmaster Eng'g, Inc.*, No. 3:10-CV-00094 JWS, 2010 WL 4386904, at *2 (D. Alaska Oct. 29, 2010) ("Under limited circumstances, 'may' can be synonymous with 'shall.'").  But, in the absence of any exclusivity language, the use of the word "may" in a forum selection provision connotes a permissive clause. *See Mims v. Arrow Financial Services, LLC*, 565 U.S. 368, 381 (2012) (concluding, in the context of a federal statute, that no exclusive federal jurisdiction exists absent exclusive language, such as "only," that specifies an action may only be brought in state court).

Only a "valid" forum selection clause is given controlling weight.  *AH Marine*, 571 U.S. at 63. "Forum selection clauses are enforced only when they encompass the claim at issue." *Light v. Taylor*, 317 F. App'x. 82, 83 (2d Cir. 2009) (citation omitted). Where a forum selection clause does not apply to the dispute in a case, a motion to transfer is evaluated under the

conventional § 1404(a) factors. *See, e.g., Steinmetz v. McGraw-Hill Glob. Educ. Holdings, LLC*, 220 F.Supp.3d 596, 606 (E.D. Pa. 2016).

**B.**

This case centers on a claim of breach of the Contract. At issue here is the interpretation of a provision of the Contract concerning forum selection. This implicates principles of contract construction under Maryland law.

In general, a contract is defined as "a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." RICHARD A. LORD, 1 WILLISTON ON CONTRACTS § 1:1, at 2-3 (4th ed. 1990); *accord* Restatement (Second) Contracts § 1, at 5 (1981); *see also Maslow v. Vanguri*, 168 Md. App. 298, 321, 896 A.2d 408, 421-22, *cert. denied*, 393 Md. 478, 903 A.2d 416 (2006). "'A contract is formed when an unrevoked offer made by one person is accepted by another.'" *Cty. Comm'rs for Carroll Cty. v. Forty W. Builders, Inc.*, 178 Md. App. 328, 377, 941 A.2d 1181, 1209 (2008) (quoting *Prince George's County v. Silverman*, 58 Md. App. 41, 57, 472 A.2d 104, 112 (1984)). Thus, mutual assent is an integral component of every contract. *See, e.g., Joseph Saveri Law Firm Inc. v. Michael E. Criden, P.A.*, 759 F. App'x 170, 173 (4th Cir. 2019) (recognizing as a "bedrock principle of law" that an offeree must accept an offer to form a contract); *Cochran v. Norkunas*, 398 Md. 1, 14, 919 A.2d 700, 708 (2007); *Advance Telecom Process LLC v. DSFederal, Inc.*, 224 Md. App. 164, 177, 119 A.3d 175, 183 (2015).

Mutual assent is essential to the formation of a contract. *Falls Garden Condo. Ass'n, Inc. v. Falls Homeowners Ass'n, Inc.*, 441 Md. 290, 302, 107 A.3d 1183, 1189 (2015); *see also Mitchell v. AARP*, 140 Md. App. 102, 116, 779 A.2d 1061, 1069 (2001) ("An essential element with respect to the formation of a contract is 'a manifestation of agreement or mutual assent by

14

the parties to the terms thereof; in other words, to establish a contract the minds of the parties must be in agreement as to its terms.'" (citations omitted)).   "Manifestation of mutual assent includes two issues: (1) intent to be bound, and (2) definiteness of terms."   *Cochran*, 398 Md. at 14, 919 A.2d at 708.

"'The cardinal rule of contract interpretation is to give effect to the parties' intentions.'" *Dumbarton Imp. Ass'n. Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 51, 73 A.3d 224, 232 (2013) (citation omitted).   To determine the parties' intention, courts look first to the written language of the contract.   *Walton v. Mariner Health of Maryland, Inc.*, 391 Md. 643, 660, 894 A.2d 584, 594 (2006) ("[G]enerally, when seeking to interpret the meaning of a contract our search is limited to the four corners of the agreement."); *Hartford Acc. & Indem. Co. v. Scarlett Harbor Assoc. Ltd. P'ship*, 109 Md. App. 217, 291, 674 A.2d 106, 142 (1996) ("[T]he court must, as its first step, determine from the language of the agreement what a reasonable person in the position of the parties would have meant at the time the agreement was effectuated."), *aff'd,* 346 Md. 122, 695 A.2d 153 (1997).

"'The words employed in the contract are to be given their ordinary and usual meaning, in light of the context within which they are employed.'"   *DIRECTV, Inc. v. Mattingly*, 376 Md. 302, 313, 829 A.2d 626, 632-33 (2003) (citations omitted).   A court will presume that the parties meant what they stated in an unambiguous contract, without regard to what the parties to the contract personally thought it meant or intended it to mean.   *See Dumbarton*, 434 Md. at 51, 73 A.3d at 232; *Dennis v. Fire & Police Employees Ret. Sys.*, 390 Md. 639, 656, 890 A.2d 737, 747 (2006); *PaineWebber Inc. v. East*, 363 Md. 408, 414, 768 A.2d 1029, 1032 (2001); *see also, e.g.*, *Scarlett Harbor,* 109 Md. App. at 291, 674 A.2d at 142 ("Where the language of a contract is

clear, there is no room for construction; it must be presumed that the parties meant what they expressed.").

Under Maryland law, the interpretation of a contract is "ordinarily a question of law for the court." *Grimes v. Gouldmann*, 232 Md. App. 230, 235, 157 A.3d 331, 335 (2017); *see also Spacesaver Sys., Inc. v. Adam*, 440 Md. 1, 7, 98 A.3d 264, 268 (2014); *Myers v. Kayhoe*, 391 Md. 188, 198, 892 A.2d 520, 526 (2006); *Towson Univ. v. Conte*, 384 Md. 68, 78, 862 A.2d 941, 946 (2004); *Lema v. Bank of Am., N.A.*, 375 Md. 625, 641, 826 A.2d 504, 513 (2003); *Under Armour, Inc. v. Ziger/Snead, LLP*, 232 Md. App. 548, 552, 158 A.3d 1134, 1136 (2017). "Maryland courts interpreting written contracts have long abided by the law of objective contract interpretation, which specifies that 'clear and unambiguous language' in an agreement 'will not give way to what the parties thought the agreement meant or was intended to mean.'" *Urban Growth Prop. Ltd. P'ship v. One W. Balt. St. Assocs. LLC*, No. 882, Sept. Term, 2015, 2017 WL 526559, at *5 (Md. Ct. Spec. App. Feb. 9, 2017) (citation omitted) (unpublished); *see Cochran*, 398 Md. at 16, 919 A.2d at 709; *Huggins v. Huggins & Harrison, Inc.*, 220 Md. App. 405, 417, 103 A.3d 1133, 1139 (2014) (internal quotations and alteration omitted).

Accordingly, when interpreting a contract, the court's "task … is not to discern the actual mindset of the parties at the time of the agreement." *Dumbarton*, 434 Md. at 52, 73 A.3d at 232. Rather, the court is to "'determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated.'" *Id.* (quoting *Gen. Motors Acceptance v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985)).

The question of whether a contract is ambiguous is one of law. *Towson Univ.*, 384 Md. at 78, 862 A.2d at 946; *Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157,

163, 829 A.2d 540, 544 (2003).  Notably, a contract is not ambiguous merely because the parties

do not agree on its meaning.  *Fultz v. Shaffer*, 111 Md. App. 278, 299, 681 A.2d 568, 578 (1996).

Rather, a contract is ambiguous "when the language of the contract is susceptible of more than

one meaning to a reasonably prudent person."  *Auction & Estate Representatives, Inc. v. Ashton*,

354 Md. 333, 340, 731 A.2d 441, 444-45 (1999); *see also Cochran*, 398 Md. at 17, 919 A.2d at

710; *Sy-Lene of Washington*, 376 Md. at 167, 829 A.2d at 547; *Calomiris v. Woods*, 353 Md.

425, 436, 727 A.2d 358, 363 (1999).

A court will not "add or delete words to achieve a meaning not otherwise evident from a

fair reading of the language used."  *Brensdel v. Winchester Constr. Co.*, 392 Md. 601, 623, 898

A.2d 472, 485 (2006).  Indeed, "[i]t is a fundamental principle of contract law that it is 'improper

for the court to rewrite the terms of a contract, or draw a new contract for the parties, when the

terms thereof are clear and unambiguous, simply to avoid hardships.'" *Calomiris v. Woods*, 353

Md. 425, 445, 727 A.2d 358, 368 (1999) (*quoting Canaras v. Lift Truck Servs.*, 272 Md. 337,

350, 322 A.2d 866, 873 (1974)); *see Loudin Ins. Agency, Inc. v. Aetna Cas. & Sur. Co.*, 966 F.2d

1443 (Table), 1992 WL 145269, at *5 (4th Cir. 1992) (per curiam) ("[A] court will not rewrite

the parties' contract simply because one party is no longer satisfied with the bargain he struck.").

## C.

PBE contends that the forum selection clause naming Maryland "found its way" into the

Contract "purely by mistake" and thus should not be enforced.  ECF 16-1 at 1.  Defendant

explains that a "former [PBE] Vice President copied and pasted the Invictus contract together

working off an earlier contract [PBE] had with a separate Maryland company."  *Id.* at 1-2.

According to PBE, when the parties "entered into their agreement neither Invictus nor [PBE]

intended Maryland to be the dispute-resolution forum," and thus the inclusion of the clause is the

product of a mutual mistake. *Id.* at 2. Thus, PBE insists that because the forum selection clause is a product of mutual mistake, it should be "deemed a legal nullity." *Id.* at 6. It contends that under Maryland law the Contract can be reformed "in line with the parties' actual bargained-for expectations." *Id.* at 7.

In support of its claim of error, PBE states that "lawyers did not draft the contract, [PBE]'s attorneys did not review the contract before [PBE] executed it, and based on the patent errors in paragraph 9, it is *highly* likely that neither did Invictus's." *Id.* (emphasis in brief). PBE points to the errant phraseology "[PBE standard forum of law is Florida]," included at the beginning of the forum selection clause, as evidence that it "did not have counsel review the contract." *Id.* at 3. And, it contends, the errant language shows that Invictus did not, either. *Id.* Moreover, it asserts that no work was performed in Maryland under the Contract. *Id.* at 3.

PBE also submitted the Declaration of Mark Edwards (ECF 16-2), PBE's Executive Vice-President. *Id.* ¶ 2. Edwards does not claim to have participated in the negotiation of the Contract, but is "familiar with the negotiations." *Id.* ¶ 4. He contends that neither party signed the contract in Maryland, *id.* ¶ 5, nor did PBE have an attorney draft or review the agreement. *Id.* ¶ 7. And, he asserts that "Invictus did not perform any work under the contract in Maryland, nor was work in Maryland specifically contemplated when the contract was negotiated and signed." *Id.* ¶ 9.

Alternatively, PBE argues that, even if the Court concludes that the forum selection clause is valid, the clause is merely permissive, and thus the Court should conduct the "traditional § 1404 analysis." *Id.* at 9. PBE posits that the use of the word "shall" in a forum selection clause "is not dispositive" under the Fourth Circuit's holding in *BAE Sys Tech. Solutions & Serv's, Inc. v. Rep. of Korea's Def. Program Acquisition Admin.*, 884 F.3d 463, 470

(4th Cir. 2018). *Id.* at 9-10. And, PBE maintains that the factors in the § 1404 analysis favor transfer to the Southern District of Florida.

In this regard, defendant contends that because none of the conduct in the Complaint occurred in Maryland, Invictus's choice of venue should not be accorded deference. *Id.* at 10-11. Further, PBE argues that Invictus's choice of venue should not be accorded deference because "[m]ost of Plaintiff's five claims have nothing to do with the contract whatsoever. . . ." *Id.* at 12. And, PBE asserts that "there are no Maryland witnesses." *Id.* Because PBE is based in Florida and plaintiff "conducts its primary business from Alabama," PBE argues that convenience of the parties favors a transfer to the Southern District of Florida. And, PBE maintains that the interests of justice are best served by a transfer, because "the Southern District of Florida is significantly less burdened than the District of Maryland, with the Southern District of Florida disposing of civil cases almost 100% faster." *Id.* at 14. Further, it contends that, while "[i]t is unclear at this time what substantive law will apply to [the] dispute[,]" there would be no particular concern about a Florida court applying "run-of-the-mill" Maryland contract law. *Id.* at 15.

On the other hand, Invictus argues that the clause is not the result of a mutual mistake, and therefore the Contract cannot be reformed. ECF 23-1 at 6. Through the Declaration of its Vice-President, Nate Hoffman (ECF 23-2), Invictus asserts that the Contract was executed with the understanding that Maryland was the forum of choice. *Id.* ¶¶ 9, 10; *see also* ECF 23-1 at 5.[10] Further, Invictus posits that it understood PBE to be engaged in business in Maryland, and "thought nothing unusual about Maryland being the chosen forum of the parties' contract." *Id.*

---

[10] PBE and Invictus have both submitted declarations concerning the issue of mutual mistake. Parol evidence is "freely admissible to establish allegations of fraud, mistake, or other equitable grounds for relief." *Yarn Indus., Inc. v. Krupp Int'l, Inc.*, 736 F.2d 125, 129 (4th Cir.1984) (citing *McLeod v. Sandy Island Corp.*, 216 S.E.2d 746 (S.C. 1975)).

ECF 23-1 at 5.  According to Invictus, it "not only accepted Maryland as its chosen forum, but it also favored Maryland as 'neutral ground.'"  *Id.*

According to Invictus, the forum selection clause at issue here is "prima facie valid," *id.* at 7, should be given significant weight, and "inconvenience alone is not sufficient grounds to avoid the application of a forum selection clause."  *Id.* (emphasis omitted).  Indeed, Invictus maintains that the forum selection clause is mandatory, *id.* at 8, and therefore the Court can consider only the "public interest factors" of the § 1404 analysis, that is, the interests of justice. *Id.* at 9.  In its view, circumstances must be "extraordinary" to overcome a valid forum selection clause, and "[c]laims of a faster Florida docket do not meet this burden."  *Id.* at 13.

Moreover, Invictus maintains that some of the work under the Contract was, indeed, performed in Maryland.  Nate Hoffman avers in his Declaration (ECF 23-2) that he traveled to Maryland "in furtherance of procuring contracts for PBE."  *Id.*, ¶ 11.  He also avers that he worked with a local company called MVII and "conducted business on behalf of PBE with Aberdeen Proving Ground, and other facilities in Cambridge, Maryland, Belcamp, MD for SURVICE Engineering, and the Chesapeake Testing facility."  *Id.*  Invictus also submitted an exhibit demonstrating that SURVICE Engineering is located in Belcamp, MD.  ECF 23-5.  And, Invictus submitted an exhibit showing that PBE is registered in Maryland, ECF 23-3, and that it has a sales representative for Maryland.  ECF 23-4.

## D.

As a threshold matter, this Court cannot conclude that the terms of the forum selection clause are the product of mutual mistake.  PBE contends that the mistake was mutual (*see, e.g.*, ECF 16-1 at 6), but Invictus maintains that it was not.  ECF 23-1 at 5.

Nate Hoffman, plaintiff's Vice-President, avers in his Declaration (ECF 23-2) that he "participated in the negotiation" of the Contract.  *Id.* ¶ 3.  He explains that when he received the

proposed Contract, he "forwarded same to Daniel Hoffman, Invictus COO and General Counsel." *Id.* ¶ 7. According to Nate Hoffman, he "noticed that Defendant PBE had chosen Maryland as its forum in the event any disputes arose from the Contract." *Id.* ¶ 8. Hoffman avers that Invictus "perceived the courts of Maryland to be neutral with respect to" PBE and that he "signed the Contract fully aware of Maryland as its choice of forum." *Id.* ¶¶ 9, 10.

PBE has presented no evidence to the contrary. Rather, it has only admitted to its own mistake. Accordingly, there are no grounds for the Court to reform the Contract by removing the forum selection clause. Therefore, I turn to review the Contract clause in light of applicable statutory provisions.

Under 28 U.S.C. § 1404(a), this is a case that "might have been brought in the destination venue." *In re: Volkswagen*, 545 F.3d at 312 (internal quotations omitted). In order to satisfy that requirement, venue in the transferee court must be proper, and that court must have personal jurisdiction over the defendant. *D2L Ltd. v. Blackboard, Inc.*, 671 F. Supp. 2d 768, 778 (D. Md. 2009).

Section 1391 of Title 28 of the United States Code governs "the venue of all civil actions" filed in federal district court. *Id.* § 1391(a). It provides for venue, as follows:

(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

(3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

According to the Complaint, PBE is a Florida corporation with its principal place of business in Pompano Beach, Florida. ECF 1, ¶ 2. PBE notes that Pompano Beach "is located

between Fort Lauderdale and West Palm beach and is in the Southern District of Florida." ECF 16-1 at 5, n.2.[11] Therefore, the Southern District of Florida is certainly a proper venue, because PBE could have been sued in that forum. But, that determination does not compel transfer to Florida, in light of the Contract's forum selection clause.

The parties disagree about the legal effect of the forum selection clause. Defendant maintains that the Fourth Circuit's holding in *BAE Sys Tech. Solutions & Serv's, Inc.*, 884 F.3d 463 (2018), controls. PBE argues that, like the forum selection clause at issue in *BAE*, the forum selection clause here is permissive, not mandatory. ECF 16-1 at 6. If the clause is permissive, the Court should consider all of the factors in the § 1404(a) analysis in determining whether to apply the clause. If, however, the forum selection clause is mandatory, as Invictus contends, the Court considers only the so-called "public interest factor" of the § 1404(a) analysis, namely, the interests of justice. *See* ECF 23-1 at 10.

In *BAE*, 884 F.3d 463, "a United States defense contractor, BAE Systems Technology Solutions & Services, Inc." ("BAE"), sued the Republic of Korea "and its defense Acquisition Program" (collectively, "Korea") for breach of contract. *BAE*, 884 F.3d at 467. The contract between the parties contained a forum selection clause that stated that any dispute between BAE and Korea "shall be resolved through a litigation and the Seoul Central Court shall hold jurisdiction." *Id.* at 469. After BAE filed suit in federal court, Korea "initiated a suit in a Korean court to litigate essentially the same issues." *Id.* The district court in *BAE* "refused to enjoin the litigation in Korea." *Id.*

---

[11] PBE directs the Court to a link that no longer appears to be valid. However, the Court takes judicial notice of the United States District Court for the Southern District of Florida's website at https://www.flsd.uscourts.gov/federal-judicial-districts-florida.

On appeal, the Fourth Circuit explained: "A mandatory clause requires litigation to occur in a specified forum; a permissive clause permits litigation to occur in a specified forum but does not bar litigation elsewhere." *Id.* at 470. Moreover, only a mandatory clause is given a "presumption of enforceability." *Id.* at 471. And, the Court instructed: "'[A]n agreement *conferring* jurisdiction in one forum will not be interpreted as *excluding* jurisdiction' in another unless the clause expressly sets forth 'specific language of exclusion.'" *Id.* at 472 (quoting *IntraComm*, 492 F.3d at 290 (alterations and emphasis in *BAE*).

As to the forum selection clause at issue in *BAE*, the Court found that it did not contain "specific language of exclusion." *BAE*, 884 F.3d at 472. Although the clause, "and the Seoul Central shall hold jurisdiction," conferred jurisdiction on the Seoul Central Court, it did not designate that court as the only court with jurisdiction. *Id.* The Court reasoned that, in context, the use of the word "shall" did "not render [the clause] mandatory." *Id.*

As noted, the forum selection clause in the Contract here states (emphasis added):

> 9. <u>Governing Law/Jurisdiction</u>. [PBE standard forum of law is Florida] This Agreement is made and entered into in the State of Maryland and shall be governed and construed in accordance with the laws of Maryland, without regard to its conflict of laws principles. *The Parties also agree that any dispute between the parties shall be resolved in the courts of Maryland*, and each party consents to the exercise of personal jurisdiction by the courts of Maryland and expressly waives any argument of forum nonconveniens. The parties waive a trial by jury.

The language of the forum selection clause here differs significantly from the clause at issue in *BAE*. Although the use of the word "shall" does not automatically render the clause mandatory, the clause here expressly states that *any dispute* between the parties "shall be resolved in the courts of Maryland." This is the same as stating that *all* disputes shall be resolved in the courts of Maryland. The clause does not simply say that Maryland courts shall have jurisdiction, along with other courts. There is no room here for resolution of disputes

23

between the parties in courts outside of Maryland.  As a result, I find that the forum selection clause is mandatory.

Further, I conclude that the dispute here falls within the scope of the forum selection clause.  Invictus alleges, *inter alia*, breach of the Contract, which is plainly within the scope of the clause.  ECF 1, ¶¶ 52-59.  All of the counts arise out of the Contract.  The language of the forum selection clause is broad enough to encompass not just the Contract claim, but the related claims as well.  *See Varsity Gold*, 2008 WL 5243517 at *3 (stating that "courts in this circuit have consistently found facially contractual forum selection clauses to apply to related tort claims."); *see also Belfiore v. Summit Federal Credit Union*, 452 F.Supp.2d 629, 632 D. Md. 2006 (finding a forum selection clause to encompass related tort claims); *In re Eternity Shipping, Ltd., Eurocarriers, S.A. for Exoneration from or Limitation of Liability*, 444 F. Supp. 2d 347, 384 (D. Md. 2006) (finding a forum selection clause in a seaman's employment contract to encompass plaintiff's tort claims related to the seaman's death); *Berry v. Soul Circus, Inc.*, 189 F.Supp.2d 290, 294 (D. Md. 2002) (finding a forum selection clause in a performer's employment contract to encompass plaintiff's tort claims, including a claim for unjust enrichment).

Further, defendant's arguments of mutual mistake do not rebut the presumption of reasonability.  In fact, PBE does not advance any arguments specifically to rebut the presumption of reasonability, other than its arguments for the convenience of the parties and witnesses, which are discussed, *infra*.  Therefore, the forum selection clause is presumptively enforceable.

In support of its contention that the public interest factors weigh in favor of transfer, PBE compares the docket loads of the District of Maryland and the Southern District of Florida.  ECF 16-1 at 14; ECF 16-3.  Invictus counters that the burden is on PBE to demonstrate "the existence

of extraordinary circumstances to support transfer of this case to Florida", and asserts that claims of "a faster Florida docket" do not meet this burden.  ECF 23-1 at 12-13.  And, it argues that the fact that any judge can apply "run of the mill" Maryland contract law does not counsel in favor of transfer.  *Id.* at 13.

The interests of justice factor is "amorphous and somewhat subjective," and allows a court to "consider many things." WRIGHT & MILLER § 3854. The Court must "'weigh the impelling need for efficiency in the administration of our court system against the right of [the plaintiff] to continue the trial in a forum [it chose],'" *Cluck-U, Corp. v. Cluck-U Chicken, Inc.*, PWG-15-3439, 2016 WL 9526438, at *4 (D. Md. May. 7, 2016) (quoting *General Tire & Rubber Co. v. Watkins* 373 F.2d 361, 368 (4th Cir. 1967) (alterations in *Cluck-U*).

As the Supreme Court noted in *Atlantic Marine*, 571 U.S. at 66: "In all but the most unusual cases. . . 'the interest of justice' is served by holding parties to their bargain."  This is not a particularly unusual case.  Given that the Contract contains a mandatory forum selection clause naming Maryland, and a choice-of-law provision selecting Maryland law, the fact that courts in the Southern District of Florida decide cases faster will not deprive Invictus of its bargained-for choice of forum.

Alternatively, even if the forum selection clause were permissive, I would reach the same result.

"As a general rule, a plaintiff's 'choice of venue is entitled to substantial weight in determining whether transfer is appropriate.'" *Trustees of the Plumbers and Pipefitters Nat. Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 444 (4th Cir. 2015) (quoting *Bd. of Trs. v. Sullivant Ave. Props., LLC*, 508 F. Supp. 2d 473, 477 (E.D. Va. 1988)); *see also, e.g., Arabian v. Bowen*, 966 F.2d 1441 at *1 (4th Cir. 1992) (per curiam) (table).  Indeed, unless the balance of

factors points "strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Collins v. Straight, Inc.*, 748 F.2d 916, 921 (4th Cir. 1984); *see Gilbert v. Freshbikes, LLC*, 32 F. Supp. 3d 594, 607 (D. Md. 2014); *Mamani*, 547 F. Supp. 2d. at 469.  To be sure, this is particularly true where "'the chosen forum is the plaintiff's home or bears a substantial relation to the cause of action.'" *comScore, Inc. v. Integral Ad Science, Inc.*, 924 F. Supp. 2d 677, 682 (E.D. Va. 2013) (quoting *Pragmatus AV, LLC v. Facebook, Inc.*, 769 F. Supp. 2d 991, 995 (E.D. Va. 2011)).  That circumstance is not pertinent here.  But, that fact is not dispositive.

Although a plaintiff's choice of forum "is ordinarily accorded considerable weight . . . .", *Lynch*, 237 F. Supp. 2d at 617, "that weight is significantly lessened when none of the conduct complained of occurred in the forum selected by the plaintiff and said forum has no connection with the matter in controversy."  *Id.*; *see also Bannister v. Wal-Mart Stores E., L.P.*, 843 F. Supp. 2d 610, 615 (E.D.N.C. 2012) ("[T]he deference given to a plaintiff's choice of forum is proportionate to the relationship between the forum and the cause of action."); *Mamani*, 547 F. Supp. 2d at 473 ("[A] court need not accord the choice as much weight when the 'forum has no connection with the matter in controversy.'") (citation omitted); *Bd. of Trustees v. Sullivant Ave. Properties, LLC*, 508 F. Supp. 2d 473, 477 (E.D. Va. 2007) (observing that the weight of plaintiff's choice of forum "varies depending on the significance of the contacts between the venue chosen by Plaintiff and the underlying cause of action").

PBE contends that the Contract was not performed in Maryland, and Maryland is not Invictus's home jurisdiction.  ECF 16-1 at 10-11.  However, Invictus contends: "Performance of part of [PBE's] contract with the Plaintiff occurred In Maryland. . . ."  ECF 23-1 at 13.  In support of this contention, Invictus points to Nate Hoffman's Declaration, stating that his "performance under [the Contract] required [him] to travel to Maryland in furtherance of

26

procuring contracts for PBE."  ECF 23-1, ¶ 11.  He avers that he worked with MVII, Aberdeen Proving Ground, SURVICE Engineering, and the Chesapeake Testing facility, all in Maryland. *Id.*

PBE counters that these assertions are "overstated."  ECF 24 at 2.  It argues: "[A]t best, if credited, Hoffman has merely described that certain occasional and immaterial work occurred in Maryland, a fact which [PBE] contests."  *Id.* at 3.

In light of the dispute as to the locale of some of Invictus's performance under the Contract, plaintiff's choice of forum must be given some weight.

PBE also contends that the convenience of the witnesses cuts in favor of transfer to the Southern District of Florida.  ECF 16-1 at 12.  It provides a list of ten potential witnesses, five of whom reside in Florida, two in Virginia, one in Alabama, one in Texas, and one in Oregon. ECF 16-2 at 4.  "Perhaps the most important factor to be considered by a court in passing on a motion to transfer is the convenience of the witnesses."  *Cronos Containers, Ltd. v. Amazon Lines, Ltd.*, 121 F. Supp. 2d 461, 466 (D. Md. 2000); *accord Mamani*, 547 F. Supp. 2d at 473; *see also* 15 C. WRIGHT & MILLER, FED. PRACTICE & PROCEDURE § 3851 (4th ed.) ("WRIGHT & MILLER") ("The convenience of witnesses, particularly nonparty witnesses important to the resolution of the case, is often cited as the most significant factor in ruling on a motion to transfer under 28 U.S.C.A. § 1404(a).").

However, as noted, the burden here belongs to PBE.  "In order to carry this burden, the movant should submit, for example, affidavits from witnesses and parties explaining the hardships they would suffer if the case were heard in the plaintiff's chosen forum." *Dow*, 232 F.Supp.2d at 499 (citing *Helsel*, 198 F.Supp.2d at 712).  PBE has submitted no such evidence,

and has instead provided "[m]ere assertions of inconvenience or hardship[.]" *Dow*, 232 F.Supp.2d at 499.

Accordingly, I shall deny PBE's Motion to Transfer.

### III. Conclusion

For the foregoing reasons, I shall deny the Motion to Transfer.   And, I shall grant the Motion to Dismiss.

An Order follows.


Date:   April 30, 2020                                        _____/s/_____
                                                             Ellen Lipton Hollander
                                                             United      States      District      Judge